UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

DR. AL-HAJJ IDRIS A. MUHAMMAD and
SIRAJ IBN WAHHAJ

                Plaintiffs Inpropria Persona Sui Juris,

    -against-                                                 Civil Action
                                                              No. 05-1851

ROBERT C. BONNER, Commissioner, U.S. Customs,
and Border Protection; SUSAN MITCHELL, Director of      (Dearie, J)
Field Operations; THOMAS WILLIAMS, Supervisory       ( Bloom, M.J.)
Border Protection Officer; ROBERT FAGAN, U.S.
Immigration and Customs Enforcement Agent; BRYANT
WONG, U.S. Immigration and Customs Enforcement Agent;
TWO UNKNOWN BORDER PROTECTION OFFICERS,

                Defendants.

-----------------------------------------------------------------------x

STATE OF NEW YORK
COUNTY OF KINGS

**AFFIRAMTION OF SIRAJ IBN WAHHAJ**

    I, Siraj ibn Wahhaj, make the following affirmation under the penalties of perjury:

    1. I am the Plaintiff Inpropria Persona Sui Juris, in the above entitled action and I am a United States citizen. I make this affirmation in opposition to Defendants motion for summary judgment.

    2. In or about October of 2004, I was due to depart on an Air Maroc airline to Morocco. After checking in at the airline desk, I was called upon by two border protection officers for inspection. The officers photocopied my personal identification, which included my bank account information.

3. In addition, the government agents took cotton swabs of the front and back of my hands. I found this experience extremely intrusive especially since I was leaving the country and not entering. Nevertheless, I thought little about this event until my return from Morocco.

4. On January 24, 2005, I arrived at John F. Kennedy Airport ("JFK") on Air Maroc Airlines, returning from my trip to Morocco.

5. As I walked through the corridor used to disembark the plane, I met three border protection officers ,Bridgeforth, and two unknown agents. When Bridgeforth saw my passport, he said to another agent, "we got him." All three agents thereafter stopped checking passenger passports and escorted me to a room and I was told to take a seat and could not leave.

6. When I needed to answer the call of nature, I was escorted by an border protection officer to the bathroom. While, I had suspicion that I was not allowed to leave the detention room, the fact that I was escorted to the bathroom cemented my belief that I was at all times being detained.

7. After four hours passed, during which no one asked me a single question, immigration and customs enforcement agents Bryant Wong and Robert Fagan appeared and began asking me questions. The agents asked me some preliminary questions to which I responded: "you already know the answers to the questions, why am I being held."

8. At that point agent Fagan told me that if I did not cooperate that he could keep me in the room for a long time. During the brief interrogation, Brdigeforth thumbed through my belongings and my baggage, the latter of which he had personally brought into the detention room after having retrieved them from the plane.

9. After the brief questioning, which prove fruitless for the agents, I was told that I could leave. Before I left however, Bridgeforth told me that in the future I should cooperate or else the immigration and customs enforcement agents could make it difficult on my wife, who is a citizen of Morocco. While I do not believe that the Bridgeforth was threatening my wife with physical force, I believe he was referring to making difficulties for my wife if she decided to apply for a visa to enter the United States.

10. This incident was highly suspicious as an attempt to harass me and keep me detained illegally for no reason.

11. I believe this because of what happened to me in October of 2004, (discussed above), the January 24, 2005, incident, and a subsequent incident, that occurred on a return trip from a separate vacationing in Morocco. Had there been one incident, I would have let the incident pass. But, three incidents of government stops for no reason that even seems vaguely related to routine stops is highly suspicious.

12. On March 17, 2006, I was returning from another trip to Morocco, subsequent to the January 24, 2005, incident.

13. As I embarked from the plane, I was once again met by two border protection officers Lloyd and Hazel, who were looking at passenger passports.

14. After checking my passport, agent Hazel said to Lloyd, "that's it," as if to signify that their search for me had been completed. From my observations, the passport check that the border protections officers had been dutifully performing was completely abandoned after they "got me."

15. Although it appears in the motion to amend the complaint that the statement, "we got him" occurred on the March 17, 2006, incident, it actually occurred on the January 24, 2005 incident. The March 17, 2006 incident is the "that's it" incident.

16. The "that's it" statement, coupled with the "we got him" statement is rather disturbing because I have done nothing wrong and till this day, the government has come forward with no reason for stopping me. .

17. After Hazel and Lloyd took my passport, I was again escorted to the same "detention" room and told to wait. This particular incident was not nearly as long as the January 24, 2005, event because agent Bridgeforth was the same person who questioned me. I spent nearly two hours waiting before anyone spoke to me. Again, I was told that I could not leave.

18. When Bridgeforth finally arrived, he quickly realized that unless he told me why I was being detained I would not answer his questions. I also refused to give him my wallet as I had done previously. I was beginning to realize that if I was detained, the border protection officers could use anything against me to further their "investigation."

19. Soon thereafter, Bridgeforth told me that I could leave.

20. As I made my way again through customs, an unknown agent and agent Rollo stopped me and briefly checked my bags. During the bag check, supervisory officer with U.S. customs and border protection Rollo proceeded to ask me some more questions about my wife. He asked how many times I went to the U.S. embassy and whether I intended to bring my wife to the U.S. When I answer in the negative, he became argumentative because I said I had no intention on bringing my wife to the U.S.

21. All these incidents, give me reason to believe and I hope the Court as well, all the stops were not the least bit routine but rather, a targeted harassment of an innocent individual who just happens to be the son of the famous Muslim Imam Siraj Wahhaj.

23. Had my stops happened once or even twice for short amounts of time, I would never paid attention to them. However, three stops on two trips to Morocco including one in which a U.S. customs and border protection officer said "we got him" makes me believe that something more pernicious was behind these so called "routine stops."

24. **WHEREFORE**, I request that the Court denies Defendants' motion for summary judgment as it is premature and without merit. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 1427 Jumad-al- Awwal 8 - June 4, 2006
       Brooklyn, NY

_____
SIRAJ IBN WAHHAJ